IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **AARON FILLMORE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **97-844-CJP**[1] |
| | ) | |
| **THOMAS F. PAGE, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

**PROUD, Magistrate Judge:**

   Plaintiff Aaron Fillmore is in the custody of the Illinois Department of Corrections, and at all times relevant to the above-captioned suit he was housed at Menard Correctional Center. Plaintiff's Second Amended Complaint alleges that on February 4, 1997, multiple prison officials subjected him to cruel and unusual punishment in violation of the Eighth Amendment during the course of moving him and three other inmates from the West Cell House to the Segregation Unit.  **(Doc. 53).**  Plaintiff's journey between prison buildings involved several segments of activity, with various defendants participating at different times in varying ways.  In *Fillmore v. Page*, 358 F.3d 496 (7th Cir. 2004), the Court of Appeals for the Seventh Circuit remanded this case, in part, for further proceedings.  Following additional discovery and a bench trial, the Court issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

---

   [1]Pursuant to 28 U.S.C. § 636(c)(1), upon the consent of the parties, U.S. District Judge J. Phil Gilbert referred this case to U.S. Magistrate Judge Clifford J. Proud for final resolution. **(Docs. 112, 113 and 126).**

**Procedural History and Current Posture of the Case**

A discovery sanction caused the Court to sever the trial of defendants Page and Cleland from the other defendants who reached the trial stage in this case: Wilson, Chamness, Shemonic, Best, McCall, Jack, Higgins, Henderson, Potts and Scott. Page and Cleland proceed to trial first, in June, 2002. At the close of plaintiff's case-in-chief Page was dismissed pursuant to Federal Rule of Civil Procedure 50. The jury found in favor of defendant Cleland. The other defendants did not proceed to trial. Rather, in an awkward turn of events, based on the parties' "Stipulated Trial Testimony" and the record from the Page/Cleland trial, the Court entered judgment against plaintiff pursuant to Federal Rule of Civil Procedure 52(c).

Plaintiff appealed the entry of summary judgment in favor of defendants Grah and Mifflin, the Rule 50 judgment entered in favor of Page, the jury verdict in favor of Cleland, and the Rule 52(c) judgment in favor of Wilson, Chamness, Shemonic, Best, McCall, Jack, Higgins, Henderson, Potts and Scott. The Court of Appeals for the Seventh Circuit specifically affirmed:

> the judgments in favor of Henderson, Jack, Higgins with respect to the claims arising out of the transfer; the judgment in favor of Higgins with respect to the strip search; the claims against Wilson, and Page with respect to failure to intervene; the claims against Chamness, Shemonic, Best, McCall, Potts, and Scott for their action or inaction during the transfer; the jury verdict in favor of Cleland; and the summary judgments for Grah and Mifflin.

***Fillmore v. Page*, 358 F.3d 496, 510-511 (7th Cir. 2004).** However, the appellate court reversed and remanded this court's "dismissal of Fillmore's claims against the unnamed defendants[2] who allegedly beat him in the Segregation Unit for further proceedings to ascertain whether any of

---

[2] Reading the decision as a whole, it is clear that the reference to "unnamed defendants" clearly means unidentified assailants, who may or may not be named defendants.

the named defendants was involved in the beating, and if the specific actors can be identified, for further proceedings on that claim." **Id. at 511.**

Actually, the appellate decision identified two different alleged incidents to be addressed:

(1) "Fillmore alleges that upon his arrival at the Segregation Unit, one of the officers pushed his face against the bars of a caged area immediately outside the Segregation Unit, although he cannot identify which officer did so;" and

(2) "Upon reaching the cell, rather than waiting to uncuff Fillmore until he was safely locked inside the cell, Cleland uncuffed Fillmore outside the cell and then shoved him into the cell and onto the floor and began kicking and punching him. Fillmore immediately assumed the fetal position in an attempt to ward off the assault, but he saw at least two orange- clad legs joining in the beating."

**Id. at 501.** In any event, the final pretrial order entered prior to the second trial does not include any claim regarding the alleged use of force against plaintiff in the caged area outside the Segregation Unit. **(Doc. 251, p. 2).** Therefore, that particular claim is considered abandoned by plaintiff.[3] *See Vaughn v. King*, **167 F.3d 347, 352 (7th Cir. 1999) ("Pretrial orders supersede the pleadings.");** *see also* **Fed.R.Civ.P. 16(e).** The only issue for decision on remand is whether any of the remaining defendants, used excessive force against plaintiff in his segregation cell, in violation of the Eighth Amendment.

Per the appellate court's instructions, discovery was reopened and plaintiff was given yet another opportunity to identify who was involved in the incident.[4] Nevertheless, plaintiff has

---

[3]Plaintiff has unsuccessfully argued for broadening the scope of inquiry on remand beyond the parameters of the appellate court's decision, to include claims and defendants that are *res judicata*. **(*See* Doc. 251, p. 2; and Doc. 249, pp. 8-10).**

[4]As part of the 1999 discovery sanction, the statute of limitations was waived to permit amendment of the complaint to add belatedly identified Orange Crush members as defendants, and discovery was reopened (multiple times), to allow plaintiff to make every attempt over an additional two year period to identify exactly who assaulted him. **(*See* Docs. 51, 53, 75, 96, 119,**

acknowledged that he still is unable to identify exactly who assaulted him in cell 8-43 in the Segregation Unit.  (*See* **Doc. 242; and Doc. 251, p. 4, ¶ 8).**  Defendant Richard Jack is deceased; the claim against him has been dismissed pursuant to Federal Rule of Civil Procedure 25(a)(1).  **(Doc. 262).**  Therefore, the only defendants remaining at this juncture are Wilson, Chamness, Shemonic, Best, McCall, Higgins, Henderson, Potts and Scott.

## Summary of the Evidence

The Court hereby adopts the "Uncontroverted Facts" agreed to by the parties in the Final Pretrial Order **(Doc. 251, p. 4)**, and generally incorporates what is depicted on the videotape in evidence **(Plaintiff's Exhibit 1).**  In summary, it is undisputed that on February 4, 1997, at approximately 1:15 p.m., defendants Shemonic, Best, McCall, Jack, Higgins, Henderson, Potts and Scott were collectively activated as the Tactical Unit at Menard Correctional Center and dispatched to the West Cell House.  Defendant Wilson was the commander of the Tactical Unit and he accompanied the team on February 4, 1997.  Defendant Chamness was assigned to Internal Affairs at Menard and was the videographer who accompanied the Tactical Unit on the date in question.  The Tactical Unit moved plaintiff and three other inmates, Zennon, Beauchamp and Ramlow, from the West Cell House to the North 1 Segregation Unit, where they were each strip searched before being placed into their respective new cells.

According to plaintiff, inmate Zennon, who was two cells down from plaintiff, threw something on one correctional officer and then another, which lead to plaintiff and inmates Zennon, Beauchamp and Ramlow being handcuffed and lined up on the gallery for transport to

---

**154, 165 and 168).**  An additional month was allotted on remand.  **(Doc. 241).**

the Segregation Unit.  **(Transcript of Trial ("Tr."), Day 2-Morning Session ("D2-AM"), pp. 59-61).**  It is undisputed that none of the four inmates offered any resistance.  **(Tr. D2-AM, p. 61).**

Defendant Wilson, the commander of the Tactical Unit, testified that he received word from the shift commander that the Unit was being mobilized and should report to Captain Gates in the West Cell House.  **(Tr. Day 1 ("D1"), pp. 32-37).**  Accordingly, all members converged on the Tactical Unit room to put their gear on– generally consisting of distinctive orange jump suits, helmets with clear masks, and light colored wood batons; none of which displays the wearer's name.  **(Tr. D1, pp. 31 and 34; and Plaintiff's Exhibit 1).**  Wilson did not know why the Unit was being mobilized until he arrived at the West Cell House and was told by Captain Gates.  **(Tr. D1, p. 33-34 and 37).**  However, defendant Henderson testified that Wilson told the Unit when they assembled that they were doing a cell extraction in the West Cell House, and defendant Shemonic similarly recalled knowing from the outset that the Unit was doing a cell extraction in the West Cell House.  **(Tr. D1, pp. 84 and 129).**  Defendant McCall's and defendant Best's discovery responses indicate they were aware, at least upon arrival at the West Cell House, that the Unit was going to perform a cell extraction on four inmates who were refusing to exit their cells, related to an assault on staff.  **(Tr. D1, pp. 153-155 and 171).**  Defendant Scott testified he learned the Unit's assignment was a cell extraction when the Unit arrived at the West Cell House, and he was completely unaware of the underlying incident.  **(Tr. D1, p. 142).**  According to defendant Potts, he did not learn about the underlying incident– the assault on two correctional officers– until he was dressing down after the escort was completed.  **(Tr. D1, p. 118).**  Similarly, Defendant Chamness, the videographer, testified that he only knew

there had been an "unusual incident" in the West Cell House, and the learned about the assault only after all of the relevant events were over. **(Tr. D2-AM, pp. 44-45).** According to inmate Kevin Blumenberg, who was celled at the end of the West Cell House, when the Tactical Unit arrived at the West Cell House, defendant Wilson (known to inmates as "Big Bubba"), Warden Page and Captain Gates had a conversation, wherein Gates said, "Kick Fillmore's ass." **(Tr. D2-AM, pp. 18-20).** Blumenberg described that conversation as occurring before Fillmore and his cellmate were removed from their cell, and before the Unit arrived. **(Tr. D2-AM, p. 20).** According to Wilson, Gates did specifically identify plaintiff, but Wilson did not recall why. **(Tr. D1-p. 40).** Wilson also did not recall Gates telling him to kick Fillmore's ass. **(Tr. D1, pp. 36, 43 and 75).**

The videotape begins just inside the West Cell House, as defendant Wilson– who is easily identifiable due to his large size and deep voice[5]– directs the Unit to pat down the inmates, who are standing cuffed in the gallery. **(Plaintiff's Exhibit 1, 00:45).** Wilson then blandly asks whether any of them need to go to the hospital. **(Plaintiff's Exhibit 1, 3:39).** According to plaintiff, he replied, "After they kick our asses." **(Tr. D2-AM, p. 65; Plaintiff's Exhibit 1, 3:45).** Wilson then instructed the Unit, "Take them to North 1." **(Plaintiff's Exhibit 1, 3:47).** Someone can be heard saying that once they get to North 1, Maue will have the cell locations for the inmates. **(Plaintiff's Exhibit 1, 3:50).** Wilson then appears to quickly pair off Unit members and inmates and the group uneventfully walks to the Segregation Unit. **(Plaintiff's Exhibit 1, 4:00-7:20).** Henderson and Jack escorted plaintiff. **(Tr. D1, p. 57).**

---

[5]Wilson's helmet bears number 63 on the front, and his vest bears the number 48 on the back; for purposes of identification Wilson can be seen and heard at the following points: 00:08; 00:14; 3:41; 4:22-24; and 32:43. **(Plaintiff's Exhibit 1).**

Upon arrival at the Segregation Unit, inmate Zennon is the first to be taken inside. Wilson can be heard asking, "Who's Fillmore?" **(Plaintiff's Exhibit 1, 8:16).** Plaintiff apparently identified himself, because Wilson is then heard saying "You are." **(Plaintiff's Exhibit 1, 8:18).** According to Wilson, he wanted the two inmates staying in the North 1 Segregation Unit; Beauchamp and Ramlow were to be celled in the North 2 Segregation Unit. **(Tr. D1, p. 61; and Plaintiff's Exhibit 1, 32:36-33:59).** Wilson can be heard saying, "We're gonna strip 'em and then just turn 'em over to you." **(Plaintiff's Exhibit 1, 9:16).** The camera then follows inmate Zennon into the strip cell area. **(Plaintiff's Exhibit 1, 9:30).** As Zennon is being searched, Wilson can be seen standing in the doorway to the cell, smoking a cigar. **(Plaintiff's Exhibit 1, 11:15).** Wilson can also be heard asking about IDs, and saying, "I just want to make sure that's Fillmore." **(Plaintiff's Exhibit 1, 12:20).** Wilson testified that he wanted IDs because he wanted to ensure the inmates went to their correct cell assignments. **(Tr. D1, p. 61).**

According to defendant Potts, who performed the search of Zennon, when the search was completed Zennon was handed over to Segregation Officers; Potts then stepped just outside the door to the Segregation Unit, where he and two or three other officers stood. **(Tr. D1, pp. 118-122).** According to Potts, if you are finished with your particular assignment, you are free to stand by until the entire Unit is finished, then the Unit collectively goes to dress down. **(Tr. D1, p 123).**

Plaintiff, escorted by defendant Henderson, then enters the cell to be strip searched. **(Tr. D1, p. 122; Plaintiff's Exhibit 1, 16:26).** As plaintiff is being lead out of the cell after the strip search, Wilson can be heard on tape saying, "I want to hold onto him until– We need his ID."

**(Plaintiff's Exhibit 1, 20:57).** Accordingly, plaintiff waited nearby while the third inmate, Beauchamp, entered the cell to be strip searched. **(Plaintiff's Exhibit 1, 21:28).** According to plaintiff, he could not be escorted out of the area until the PC line of inmates passed, so he was still there as the fourth inmate, Ramlow, was brought in to be searched; then Cleland and two other segregation officers (not wearing orange) took him up to cell 8-43. **(Tr. D2-71-72, 83 and 85).**

    Plaintiff did not see anyone in orange walking him to the cell, but he could not see who might have followed behind. **(Tr. D2, pp. 87 and 89).** According to plaintiff, a segregation guard with a hat and beard, in a green shirt, opened the cell door, and Officer Cleland told plaintiff to step into the cell. **(Tr. D2-AM, p. 74).** Cleland then uncuffed plaintiff and pushed plaintiff face down onto the ground. **(Tr. D2-AM, p. 75).** Plaintiff then balled up to protect himself, and Cleland began beating him, at which point the Tactical Unit entered the cell. **(Tr. D2-AM, p. 75).** Plaintiff felt their oak sticks striking him– only the Tactical Unit uses oak batons.[6] **(Tr. D2-AM, p. 76).** Although plaintiff did not see his assailants, he saw orange pant legs as they exited the cell– no more than two men were dressed in orange. **(Tr. D2-AM, pp. 76-77 and 89).** By plaintiff's estimation, the beating lasted a "couple minutes," during which he was yelling the entire time. **(Tr. D2-AM, p. 77).** Plaintiff incurred bruises on his back, and despite asking Cleland for medical care, he did not see a doctor for a month, and then it was for an unrelated reason. **(Tr. D2-AM, pp. 78 and 80).**

    Inmate James Armstrong, who was in cell 8-18 at the time (and is now housed at Tamms

---

[6]How the plaintiff, with his eyes covered, could discern the specific type of wood his assailants' batons or sticks were made of is a mystery.

Correctional Center with plaintiff) testified that minutes after another inmate was escorted to six gallery (presumably Zennon), he saw three officers escort plaintiff past him, Officer Cleland and two other "green shirts." **(Tr. D2-AM, pp. 26-27, 29, 30 and 35).** Plaintiff recalls seeing one orange uniform on six gallery. **(Tr. D2-AM, pp. 35-36).** Using a mirror, Armstrong watched as the group walked down the gallery and into a cell (presumably cell 8-43). **(Tr. D2-AM, p. 28).** More than three minutes later, defendant Wilson (known to Armstrong as "Big Bubba") and another person in tactical gear walked past Armstrong. **(Tr. D2-AM, pp. 26-28 and 34).** Everyone entered the cell and stayed there approximately five minutes, during which time he could hear inmates yelling plaintiff's name and banging on bars. **(Tr. D2-AM, p. 28).** Plaintiff estimated it was 10-15 minutes before Wilson and his orange-suited companion walked back by him. **(Tr. D2-AM, p. 36).**

  Inmate Sean Michael Dwyer testified that he was in cell 8-42 and he witnessed plaintiff being escorted to his cell by Officer Cleland, a few "Orange Crush" (as the Tactical Unit is commonly called), a few white shirts and "Big Bubba", who is in charge of the Tactical Unit– seven to ten people, four or five of whom were "Orange Crush." **(Tr. D2-AM, pp. 4-5 and 7-8).** A few Unit members went into the cell first to search it. **(Tr. D2-AM, p. 13).** Through a crack in his cell door, Dwyer saw Cleland and the "Orange Crush" enter the cell– a total of four or five people, but not all of the people who had escorted plaintiff to his cell. **(Tr. D2-AM, p. 5).** Plaintiff then heard plaintiff yelling, keys and punches, which indicated to Dwyer that plaintiff was being beaten. **(Tr. D2-AM, p. 5).** Dwyer began making noise and the group exited the cell. **(Tr. D2-AM, p. 6).**

  Going back in time, during the search of the third inmate, Beauchamp, defendant Wilson

9

can be seen on tape exiting out a side door.  **(Plaintiff's Exhibit 1, 21:28).**  Approximately one minute later Wilson's voice can be heard again, and Wilson can be heard a second time a little over a minute after that.  **(Plaintiff's Exhibit 1, 22:22 and 23:45).**  According to plaintiff, he was present when Ramlow was taken into the cell to be strip searched.  **(Tr. D2-AM, p. 85).**  After the fourth inmate, Ramlow, is taken into the cell to be searched, Wilson's voice can be heard several times, including a comment about IDs.  **(Plaintiff's Exhibit 1, 27:35, 29:29, 29:42, 30:08 and 30:42).**  Defendants Higgins, Shemonic and McCall were involved in the fourth strip search, and the videographer, Chamness was obviously present.  **(Tr. D1, pp. 111, 13 and 135, 157, and166).**  When the fourth and final search concluded, Wilson can be heard saying, "Make sure we've got all our equipment."  **(Plaintiff's Exhibit 1, 31:56).**

      If the videotape is played in slow motion, and the freeze-frame feature is utilized, nine Tactical Unit members– including Wilson– can be counted exiting with Beauchamp and Ramlow, headed to the North 2 Segregation Cell House, and there is no reason to question that defendant Chamness was the person holding the camera.  **(Plaintiff's Exhibit 1, 32:36-32:50; and Tr. D2-AM, p. 45).**  Approximately 14 seconds into the walk, Wilson drops out of the camera's view and is never again captured on the videotape, audibly or visually.  **(Plaintiff's Exhibit 1, 32:38-32:50).**  However, the other eight members of the Unit are all captured on the videotape as they near the North 2 Segregation Cell House and, again, Chamness the videographer is presumed present.  **(Plaintiff's Exhibit 1, 33:10 and 33:18).**  The entire walk lasted one minute and twenty-three seconds.  **(Plaintiff's Exhibit 1, 32:36-33:59).**  The last two minutes of the tape records eight members of the Unit placing Beauchamp and Ramlow in their respective cells.  **(Plaintiff's Exhibit 1, 34:00-35:50).**

According to Wilson, the Unit stayed together the entire time, although members mingled and walked about the area outside the strip cell, and after the strip searches were completed, the Unit walked the last two inmates to their cells.  **(Tr. D1, pp. 70-71).**  This point is generally corroborated by defendants Henderson, Potts and Shemonic.  **(Tr. D1, pp. 92, 96-97, 123-124, 137).**  Although the videotape lasts a total of 33 minutes and 59 seconds, what time the tape started after the Unit was called to action at 1:15 remains unknown.  However, at approximately 3:15 p.m. defendant Wilson prepared an incident report relating the activities of the Tactical Unit.  **(Doc. 251, p. 4).**

Martin "Brad" Spiller was assigned to investigate and attempt to pin down exactly who was possibly involved in the assault on plaintiff*.*  **(Tr. D1, pp. 14-15).**  Spiller testified that it was never determined exactly who escorted plaintiff to his cell after he was strip searched, even after interviewing everyone who worked that day.  **(Tr. D1, pp. 17 and 19-20).**  According to Spiller, in practice, any officer could sign out the keys and take plaintiff to his cell, and the keys could be informally passed from one person to another without notation of the log.  **(Tr. D1, pp. 23 and 25).**  Officer Cleland was working on the day in question, assigned to eight gallery on the 1:00- 3:00 p.m. shift.  **(Tr. D1, p. 25).**  However, by all accounts, there were no other individuals dressed out in orange Tactical Unit garb during the relevant time period **(Tr. D1, pp. 18-20, 35- 36, 107-108, 136, 141-142; and Tr. D2-AM, p. 43).**

## 42 U.S.C. § 1983 and the Eighth Amendment

In a civil rights suit such as this, 42 U.S.C. §1983 requires a plaintiff to show "(1) an action taken under color of law (2) which violates his federal constitutional rights." ***Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991).**  *Wolf-Lillie v.*

*Sonquist*, 699 F.2d 864, 869 (7th Cir.1983), stressed that "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a [Section] 1983 action unless he caused or participated in an alleged constitutional deprivation." **See also McBride v. Soos, 679 F.2d 1223, 1227 (7th Cir.1982).** Accordingly, liability under Section 1983 cannot be based on the doctrine of *respondeat superior*. **See Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001).** "However, a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of [S]ection 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." **Rascon v. Hardiman, 803 F.2d 269, 273-274 (7th Cir. 1986).**

Drawing from *Hudson v. McMillian*, 503 U.S. 1 (1992), in *Outlaw v. Newkirk*, 259 F.3d 833 (7th Cir. 2001), the Court of Appeals for the Seventh Circuit summarized the legal principles applicable to excessive force claims:

> The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits the "unnecessary and wanton infliction of pain" on prisoners. In cases involving the claimed use of excessive force, "the core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." In conducting this inquiry, a court must examine a variety of factors, including "the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner." With regard to the last of these factors, while a plaintiff need not demonstrate a significant injury to state a claim for excessive force under the Eighth Amendment, "a claim ordinarily cannot be predicated on a de minimis use of physical force." Indeed, "the Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Therefore, not every "malevolent touch

> by a prison guard" gives rise to a federal cause of action, even if the use of force
> in question "may later seem unnecessary in the peace of a judge's chambers."

**Outlaw, 259 F.3d at 837-838 (internal citations omitted).**

The appellate court has already ruled that the doctrine of joint liability is inapplicable to this situation.

> [Plaintiff's] case is more like *Hessel v. O'Hearn*, 977 F.2d 299 (7th Cir.1992).
> There, the plaintiffs brought a § 1983 action when a can of soda vanished during a
> search of their apartment. We held that plaintiffs' inability to identify the
> particular officer who stole the soda was fatal to their claim, but suggested that
> the result might have been different if the evidence had shown that each defendant
> was involved in the actual wrongdoing.

***Fillmore v. Page*, 358 F.3d 496, 507 (7th Cir. 2004).**

### Analysis, Findings of Fact and Conclusions of Law

The defendants argue that plaintiff has failed to prove their personal involvement in the alleged assault in cell 8-43. **(Tr. D2-AM, p. 91).** According to plaintiff, two Tactical Unit members, in orange, were involved in the alleged assault. **(Tr. D2-AM, pp. 76-77 and 89).** Plaintiff, noting that not all defendants are accounted for at all times, counters that there are three possible time frames when the assault could have occurred: (1) during the third and fourth strip searches, of inmates Beauchamp and Ramlow; (2) while inmates Beauchamp and Ramlow were walked from the North 1 Segregation Cell House to the North 2 Segregation Cell House; and (3) after the tape ends, during an estimated one hour gap before defendant Wilson wrote-up his report at 3:15 p.m. **(Tr. Day 2- Afternoon Session ("D2-PM"), pp. 101-102).**

With respect to each defendant's personal involvement, plaintiff argues that defendant Wilson– "Big Bubba"– is placed at the scene of the assault by inmates Armstrong and Dwyer. **(Tr. D2-AM, p. 92).** Because Wilson is the commander of the Unit, plaintiff contends Wilson is

13

liable whether he laid the blows or simply failed to intervene.  **(Tr. D2-AM, p. 92).**   As for defendants Chamness, Shemonic, Best, McCall, Higgins, Henderson, Potts and Scott (and even now deceased and dismissed defendant Jack), plaintiff argues that, depending on who is believed to be telling the truth, any of the remaining defendants could have been the second pair of orange clad legs plaintiff claims were involved in the assault.   **(Tr. D2-AM, pp. 92-94 and 101-102).**  However, plaintiff concedes, for purposes of the first possible time frame, during the third and fourth strip searches, defendants Higgins, Best and McCall are accounted for.  **(Tr. D2-AM, p. 94).**

As a preliminary matter, the Court notes that this Court was directed to make a preliminary finding regarding whether the alleged incident took place and, if the incident took place, then additional discovery was to be allowed.   ***Fillmore v. Page***, **358 F.3d 496, 508 (7th Cir. 2004).**   The case against defendant Cleland went to the jury and a verdict in favor of Cleland was returned, but no specific finding was rendered regarding whether the beating in the cell actually occurred, whether Cleland was just not present, or whether Cleland just didn't violate the Eighth Amendment, let alone whether any orange clad assailants were present.  Based on the evidence in the record at that juncture, the Court found as follows:

> The evidence relative to the alleged assault in cell 8-43 is a bit shakey, at least with respect to who was involved.  However, there is no cause for disbelieving plaintiff's general claim that there was some degree of "assault," and the testimony of inmate Dwyer lends a small bit of support.  Therefore, for purposes of determining whether this claim shall proceed, the Court finds that plaintiff was assaulted in cell 8-43.  The Court offers no opinion regarding exactly who assaulted plaintiff, or whether a constitutional violation occurred.

**(Doc. 241, p. 5).**

Now, after the second trial, the Court is loathe to make additional findings regarding

defendant Cleland, who has been found not liable. It should suffice to say that the Court cannot eliminate the possibility that plaintiff was escorted to his cell by defendant Cleland and others, and some degree of physical force was exerted against plaintiff. The focus in the second trial is properly on the remaining defendants and whether plaintiff has proven any of them liable, using the federal reasonable-person standard to evaluate the sufficiency of the evidence. ***Mayer v. Gary Partners and Company, Ltd.*, 29 F.3d 330 (7th Cir. 1994).**

Defendant Chamness is easily cleared of all possible involvement. Chamness was not a member of the Unit and was wearing a standard uniform, not a Tactical Unit orange jumpsuit. **(Tr. D2-AM, pp. 42-43).** Furthermore, there is simply no reason to think Chamness surreptitiously turned the video camera over to someone else and went off to assault plaintiff. **(Tr. D2-AM, p. 45).**

By plaintiff's own account, he headed upstairs to cell 8-43 during the time inmate Ramlow was being searched (the fourth search), and the assault occurred just as he entered the cell and lasted only a "couple of minutes." **(Tr. D2-AM, pp. 85-89).** Inmate Dwyer testified that Wilson and multiple other Unit members dressed in orange walked to the cell with Cleland and plaintiff, which is consistent with plaintiff's version of events. **(Tr. D2-AM, pp. 4 and 7-10).** Inmate Armstrong testified that three minutes or more passed between when plaintiff walked by him and when defendant Wilson and another Unit member in orange passed by. **(Tr. D2-AM, p. 34).** The Court concludes that, taking into account the additional three minute gap described by inmate Armstrong, the assault commenced within approximately five minutes after the search of inmate Ramlow began, and it lasted a "couple minutes," as plaintiff testified. Therefore, the assault would have concluded at what would correspond with the 31:41 minute mark on the

15

videotape. Considering all of the evidence, none of the three possible time frames suggested by plaintiff reasonably allow Wilson and another member of the Unit to leave the rest of the Unit and go to cell 8-43 to assault plaintiff.

The search of Ramlow itself took about six minutes. **(Plaintiff's Exhibit 1, 24:41-30:42).** Seven minutes and fifty-five seconds passes from the time Ramlow enters the cell to be searched and when the Unit and inmates Beauchamp and Ramlow begin the walk over to the North 2 Segregation Cell House. **(Plaintiff's Exhibit 1, 24:41-32:36).** Defendant Wilson is consistently seen or heard on the videotape during the third and fourth searches, and for the initial 14 seconds of the walk from the North 1 Segregation Cell House to North 2. **(Plaintiff's Exhibit 1, 21:28, 22:22, 23:45, 27:35, 29:29, 29:42, 30:08, 30:42, 31:56 and 32:36-32:50).** The brief gaps between when Wilson cannot be accounted for during the third and fourth strip searches are clearly insufficient for Wilson to go to cell 8-43, beat plaintiff for a "couple minutes" and return to the strip search area.

As for the other eight members of the Unit, three– Higgins, Best and McCall– are admittedly accounted for during the search of Ramlow. **(Tr. D2-AM, p. 94).** Although the whereabouts of Shemonic, Jack, Henderson, Potts and Scott is sketchy, there is no basis from which to reasonably conclude that in the seven minute and fifty-five second period they left the general area and went up to cell 8-43 to assault plaintiff *and* returned in time to appear on the videotape as the Unit made the walk over to North 2. They all denied going up to cell 8-43 and assaulting plaintiff, and there was testimony that Unit members who complete their assigned task mingle about the vicinity until the entire Unit is finished. The fourth search concluded at 30:42, almost exactly when the assault on Plaintiff would have concluded. The videotape shows many

16

orange clad people passing out of the strip cell area and heading out the door toward North 2. **(Plaintiff's Exhibit 1, 31:54-32:36).** Approximately 14 seconds into the walk, Wilson drops out of the camera's view and is never again captured on the videotape, audibly or visually. **(Plaintiff's Exhibit 1, 32:38-32:50).** However, the other eight members of the Unit are all captured on the videotape as they near the North 2 Segregation Cell. **(Plaintiff's Exhibit 1, 33:10 and 33:18).** The videotaped segment of activity from the end of the fourth search through the walk to North 2, appears to the Court to show the entire Unit proceeding as a group, which leads the Court to conclude that none of the Unit members surreptitiously left the group, went to cell 8-43 and assaulted plaintiff, and returned to join the formation on the way to North 2.

Although the eight members of the Unit can be seen at the end of the videotape when Beauchamp and Ramlow are placed in their cells, defendant Wilson's whereabouts cannot be verified after he disappears from view fourteen seconds into the walk over to North 2. Keeping in mind that the evidence indicates that the assault concluded at approximately the 31:41 mark on the tape, and Wilson is accounted for through the 32:50 mark, the Court cannot reasonably conclude that Wilson participated in an assault during the second suggested time frame.

Similarly, the third and final suggested window of opportunity is also not viable because that third period does not even commence until the tape ends at the 33:59 mark on the tape, which is two minutes and eighteen seconds after the time period when the assault occurred as described by plaintiff, Armstrong and Dwyer, and nine minutes and eighteen seconds after Ramlow enters the cell to be strip searched. **(Plaintiff's Exhibit 1, 24:41-33:59).** Furthermore, according to the defendants, they all stayed together and went to dress down after Beauchamp and Ramlow were secured in their cells. Plaintiff makes much of the fact that, aside from the defendants' own

testimony, there is no evidence confirming their whereabouts after the tape ends, and sees the hour until Wilson writes his report. However, as noted above, all of the evidence presented by plaintiff to establish a time line precludes the possibility that the assault began nine or ten minutes after the Ramlow search began and plaintiff headed to his cell.

Given the aforementioned evidence, clearly depicting the chronology of events, no reasonable person could disbelieve the defendants' assertions that they did not assault plaintiff. Plaintiff would have the Court draw sinister inferences from the fact that plaintiff was the only one of the four inmates singled out by name when the Tactial Unit arrived at the West Cell House, and from Wilson's repeated requests for IDs. However, Wilson's explanation, that he was merely trying to confirm the inmates' identities and place inmates in the proper cells, rings true when the tape is considered in its entirety. Similarly, Wilson's statement "We're gonna strip 'em and then just turn 'em over to you." supports the defendants' position that the two inmates being housed in North 1 where the searched occurred were not escorted to their cells by members of the Tactical Unit.

For purpose of this trial and the question of the remaining defendants' liability, the Court finds that none of the defendants assaulted plaintiff. Although plaintiff has never been able to establish who assaulted him, the evidence before the Court does establish that the defendants did *not* assault plaintiff. In light of the overwhelming evidence that there were no other individuals dressed out in orange Tactical Unit garb during the relevant time period **(Tr. D1, pp. 18-20, 35-36, 107-108, 136, 141-142; and Tr. D2-AM, p. 43)**, this cannot be said to be a situation where the "legendary code of silence among law enforcement officers" is protecting the perpetrator(s), as the appellate court feared. ***See Fillmore*, 358 F.3d at 507.**

**IT IS HEREBY ORDERED**, after trial without jury, for the aforementioned reasons, the Court finds that plaintiff Fillmore's claims against defendants Wilson, Chamness, Shemonic, Best, McCall, Higgins, Henderson, Potts and Scott all fail as a matter of fact and law.

**IT IS FURTHER ORDERED** that judgment shall enter in favor of defendants Wilson, Chamness, Shemonic, Best, McCall, Higgins, Henderson, Potts and Scott, and in favor of defendant Jack who was voluntarily dismissed at trial **(Doc. 262)**, and against plaintiff Fillmore; plaintiff shall take nothing from this cause of action.

**IT IS SO ORDERED.**

**DATED: March 16, 2006**

                                                   s/ Clifford J. Proud
                                                   **CLIFFORD J. PROUD**
                                                   **U. S. MAGISTRATE JUDGE**